Last case this afternoon is Official Committee of Unsecured Creditors of Allegheny Health, Education and Research Foundation v. PricewaterhouseCoopers, LLP, No. 07-1397. Mr. McCartin and Mr. Rafferty. Thank you, Your Honor. My name is Patrick McCartin. I am appearing today on behalf of the Allegheny Health, Education and Research Foundation. And do you wish to reserve time for rebuttal? I would, Your Honor. May I reserve five minutes for rebuttal, please? Yes, sir. Thank you, sir. In entering summary judgment for the defendant accounting firm here, it is our contention that the district court applied the wrong test to determine whether or not the misconduct of the officers of the foundation should be imputed to the foundation, thereby permitting application of the impari delicto defense. Instead of focusing on whether there was sufficient evidence here from which a jury could conclude that the officers were acting in their own self-interest rather than for the benefit of the corporation, the district court committed error. So you're saying that even with Rafferty that you would do what? They're relying on Rafferty, PwC, right? Well, they're relying on Rafferty for one point, and that is that we cannot invoke the innocent successor status of the unsecured creditors committee. Yeah. And we understand that. We call it all kinds of things.   Because it is viewed, to use my imprecise words, to be of unclean hands. That, your honor, is the contention. And the exceptions to Rafferty would be if they were so adverse to the company that their interests would be deemed to be adverse. That's correct. They might say that there's an exception to the exception because somebody would say that these two individuals, especially the leading individual, was it Abdulhaq? That's correct. Dominated the company. That is their contention. Okay. That's true. But what do we do to get around Rafferty? Well, first of all, Rafferty, at its consideration of Section 541 of the Bankruptcy Code, presented a matter of federal law. Whether or not the conduct or the misconduct of these corporate officers should be imputed to the foundation, and whether or not the defense of imperial delecto should be applied here, are questions presented under Pennsylvania law, state law considerations. We are not asking this court to consider anything post-petition in the bankruptcy proceedings. The premise of this appeal is that in the court below, we invoked the self-interest exception to imputation. That goes to the agent or the officer's motivation and intent. Whether or not the officer was acting from an adverse interest depends upon the motivation with which the action was taken. There was more than enough evidence of record here to demonstrate that they were acting in their own self-interest rather than for the benefit of the corporation. Looking back, they would say to you, or to us, that Mr. Abahok and the other person involved, they were following a plan that was sort of the vogue of the day. It had been, in fact, the vogue of the decade since the 80s, that you should acquire more entities. And they were following that business plan all along. And it seemed for some time to be making some sense. And the amount of monies they took out weren't, by most people's standards, egregious. So how do you say that they were acting solely for their interest and against the company? Well, first of all, Your Honor, when you say it appeared to be working out, that's because the financial statements that were presented to the board of trustees were false and misleading. Yeah, I'm talking about pre-'95-'96. At that point, things seemed to be going pretty well. But it's not at all unusual for corporations of this kind to hit a bump and then to end up doing what was done here by the officers with the knowing and willing participation of these auditors. And when you say that what they took out here, let me just answer this. Go ahead, Your Honor. You can come back to me. Do you still want the answer to be asked? Maybe. Go ahead. I'll wait. Oh, I'm sorry. Thank you. When you say what they took out here did not appear to be egregious, there's evidence of record that the chief executive officer of the University of Pittsburgh Medical Center was compensated to the tune of something in the neighborhood of $300,000. Over a two-year period, Abdelhakim Kamal, the CEO and chief financial officer of this nonprofit corporation, took more than $6 million in compensation. Much of it was tied to bonuses that were related to acquisitions and the performance results as measured by net income. The very figures that they manipulated. But what was the bigger entity in 1996? Pardon, Your Honor? Wasn't this entity much bigger than UPMC in 1996? Well, it was much bigger than UPMC in 1996. But the fact of the matter is their compensation in this case was tied to the number of acquisitions they would make. They would get bonuses for acquisitions and to favorable operating results as measured by net income. Would you suggest that alone, that having incentive pay is enough to lead to the conclusion that any decisions they made were necessarily taken with no thought to benefit the corporation, right? I mean, that would be, if the standard you're setting is they got big bonuses and therefore they were wholly self-interested, wouldn't one be forced to conclude that there's a large swath of the American publicly held companies that have CEOs and other officers that are solely self-interested because they get huge bonuses? No, I don't think so at all, Your Honor. The evidence here goes far beyond that that was held sufficient in the Farmer case and in the Buckley case. Where continued employment and related financial gain was held sufficient to create a jury question as to whether these officers were motivated in their own self-interest or acting on behalf of the corporation. The problem with the district court decision, it confuses the motivation with which action of this kind is taken with what might be the unintended or incidental benefit of such action. What if the motivation is dual? It's for their own self-interest, but it's also in the at least short-term interest of the company. Your Honor, I really don't think, in a case of this kind, where there is wrongdoing of this magnitude, and I want to point out, this is not just a case of mere negligence in performance of the audit function. This is deliberate participation in what was known to be clear violation of generally accepted accounting principles. Now, if there is some benefit that may result from this action, then I think that is only... I'm talking about motivation. I'm starting where you started. The motivation of these two bad-acting corporate executives. And I'm trying to understand why you insist that it's either wholly self-interested or it's wholly in the interest of the corporation and its owners when there's a third alternative that the motivation can be split, or I call it dual, and be both self-interested, but also in the interest and not adverse to the interests of the corporate entity. You put your finger right on it, Chief Judge Michel. And that is whether it is adverse to the entity. There are some cases, let's say the test should be whether the action was taken primarily in self-interest and not for the benefit of the corporation. It may have resulted in some incidental benefit to the corporation, even on a short-term basis as the district court held here. There is no basis, however, in Pennsylvania law or any of the decisions relied upon by the district court for the any-benefit test. What the court below said was that the adverse interest exception could not apply if there were any benefit to the corporation. And the district court found that there was a short-term benefit in permitting further acquisitions. There was actually no benefit here, which I'll address in a few moments. But in response to your question, if there is any benefit resulting, then that may be some evidence of motivation. But if the motivation is, as they said in Todd against Skelton, where the agent's conduct was examined as well, if they act in their own self-interest in a manner that is considered to be antagonistic to the corporation, then the conduct should not be imputed to the corporation. Now, in Lafferty, the court assumed that the adverse interest exception would apply, but went on to apply an exception to that exception, which was a sole actor exception, because the Shapiro family in that case dominated and controlled the Rourke directors in that situation. Now, here... Is there a question of domination here? You know there's not a sole shareholder issue. I wonder about your factual position a little bit, because on the one hand you argue an innocent decision-maker exception and say we have 30 highly qualified, well-respected corporate officers sitting on the board. If they'd known, they never would have let this happen. Well, isn't the flip side of that that since they didn't know what was going on, they were being dominated and controlled by a corporate officer, a CEO, a CFO, who were in fact running the show despite what they were trying to get done? Doesn't that assertion that these 30 people were innocent sort of cut against you if the implication is that they were getting led around? No, what it does is it presents an issue of fact, a materially contested issue of fact. If you look at the working papers of the accounts... I guess what you're saying is that somehow these two were renegades acting for their own interest and that no one else knew exactly what they were up to. Is that what you're saying? That's right. But then the question becomes Judge Michel's question. What if they were doing this for a dual purpose? They were actually thinking what had previously worked would continue to work and by the way, if it continues to work, they're going to get more money. And then we'll come to Judge Jordan's question. May I respond to Judge Jordan's question first? Go right ahead. Let me talk about the sole actor exception, or in this case the domination of this board. Look at the working papers of the auditors themselves where they said upon examination this board appears to be independent of management, extremely well qualified and diligent in the performance of its responsibilities. Don't mistake what I'm saying. I'm not suggesting that they were being dominated because I think they were being dominated. I'm suggesting that your argument that there's an independent decision maker here may be undercut if those independent decision makers are totally under the control of being dominated by, but I guess I hear your response to be they were deceived, not dominated. They were deceived, not dominated. And I think proof of the pudding here is what they did once they did learn that they were being deceived. They called for an investigation. They hired a turnaround expert. They fired these two principal officers of the corporation. On that question, was there any finding of fact as to whether they were deceived or dominated? No, the district court made no finding to that effect. So would an argument that you might have be that what you should have if you continue to follow Lafferty, that what you do is remand for a finding on that? Well, Your Honor, this is an alternative ground for affirmance here. It's alleged by PricewaterhouseCoopers. The case should certainly be remanded. But if you had a finding that they were deceived and not dominated, it would be in your favor. If you had a finding that they were dominated but not deceived, it would be a finding against you. But before you could even get to the imputation question or the question of whether or not the adverse interest exception would apply, you have to determine whether the district court applied the correct test to actually determine that. Actually, we're beyond imputation. There's an exception for adverse interest. Imputation actually is a lead-in to imperi delicto. It sets the stage for application of that doctrine. And there's an exception to imperi delicto, which you're acting in an adverse interest. And then there's an exception to that exception, which is sole actor. But I don't see why we should start at the end of the line when we really should start at the beginning because that's the word the district court did. Well, we did. I think we started at the beginning with Lafferty. Is there any way around it? And then the question was you were saying that they were acting for their own interest. Judge Michelle was saying, but what if they were acting in dual interest? Judge Jordan was saying, when you get to the end of the line, were they really dominating the board or were they merely deceiving the board? So it all plays in. Well, they are. They are all questions that shouldn't be submitted to a jury because there are contested issues of fact with respect to each and every one of these issues. The sole actor or dominant actor exception here, their own working papers say the board was independent, that it was extremely qualified, and that it was very diligent in the performance of its responsibilities. Now they're claiming that they were dominated by Abdulhaq and McConnell. And there's also evidence what occurred when they finally learned the true condition of this enterprise and they took appropriate action and testified that they would have taken action earlier had they known and not been deceived with respect to the true financial condition of the corporation. Now, with respect to the business philosophy or strategy that was followed here, Your Honor, the whole idea, and this was not that unusual, was that through economies of scale, you could combine hospitals, medical schools, and physician practices, and then with the synergies that would come into play, you could turn many of these operations which were losing money into profitable enterprises. This board believed, based on financial statements presented to them, that the strategy was working and went forward acquiring additional hospitals, losing physician practices, assuming debt, expending cash, incurring losses on an operational basis, because they thought they could afford to absorb these losses. In fact, they couldn't. Now, assume that we believed all that, or more appropriately, that giving your client the benefit of the standard that they deserve, which is every reasonable interest drawn in their favor, right, assuming that that's the state of affairs, what's the standard that should be applied? Going back to Chief Judge Michel's question, if the CEO and the CFO, even while they're doing things that are less than savory and inappropriate, they think, look, if I can just hold this thing together for a little while longer, it's all going to turn around and it's going to be great. We're going to rebound and it's all going to come back. If they've got that motivation, I suppose you'd say, well, that's for a fact finder to decide, right? Exactly. But when we are talking about this and discussing it and getting ready to say something about it, what's the standard that we should be articulating? Is it, you say, it's not that any benefit to the corporation is enough to defeat it. That's the standard applied by the district court. Right, and you disagree with that. And Chief Judge Michel was trying to press you a little bit, I think, politely to say, so in effect, what is the standard? What if they've got a dual motivation? Is that enough? What's the standard you say that we should be articulating when we speak to this issue? I think the standard is that set forth by the Pennsylvania Supreme Court in Todd v. Skelly, where they said if the agent is, or in this case the officer, is acting in their own self-interest and in a manner that is antagonistic to the interest of the corporation, then the conduct should not be imputed to the corporation. So if there was a, just so we have the language clear, where an agent acts in his own interest which is antagonistic to that of his principal or commits a fraud for his own benefit in a matter which is beyond the scope of his actual or apparent authority, the principal who has received no benefit therefrom will not be liable. There's the kicker. That's the kicker. Well, there is a kicker there, Your Honor, because they said there was no benefit in that case. Well, that's an expression of the legal principle, right? No, it's a legal expression of the principle they applied in that case consistent with the facts as they appeared in that case, where there was no benefit to the principal. In this case, if you have a benefit to the principal, the jury would have to determine whether or not the officers acted in their own self-interest and without regard to the benefit of the company. And if a benefit did result, my position is that might be some evidence of motivation going to your question of the judgment shell. But that certainly is not a controlling consideration as it was held by the district court. The district court said that the adverse interest exception will not apply except in cases where there is no benefit of any kind to the corporation. Some take 16 and 17 in the district court opinion. That position, that text, has no support in Pennsylvania law, wasn't applied to any of the cases relied upon by the district court, and as I said earlier, confuses the motivation with which action is taken with what might be an unintended or incidental result of some action. Let me ask you this question before you come back on rebuttals. This area of the law is one of which we've all done a fair amount of reading on, and there's a lot of ambiguity. There's a case of our court, Lafferty, that has interpreted Pennsylvania law in a way, in peridolipto, also with respect to deepening insolvency, that's been criticized. There is a New Jersey Supreme Court case, KPMG, which has gone the other way. Might this be a time for us to certify this question to the Pennsylvania Supreme Court for them to sort this out? I think that would be appropriate, Your Honor. And may I just say in response to your observation, I know my time has expired. When you look at all of these cases, it's very clear that the courts are concerned about two things. Protection of innocent parties and making sure the wrongdoers do not profit by their own wrongdoing. And this is why these agency principles that are developed in many of these cases break down when it comes to a question of auditor's liability. Auditors are retained in part to determine whether there are any irregularities in the financial statements. They should not be able to point to the very wrongdoing that they have either failed to detect or, as in this case, participated in to escape liability for their own wrongdoing. And that's where NCP, I think, calls it right. Well, I know we're a little over time here, but I want to take another crack at this. You've said, here's the language again. I'm quoting again because I want you to explain to me on what legal principle, what logical basis there is to excise the no-benefit piece of this statement by the Pennsylvania Supreme Court. You're saying to us, if I heard you correctly, Ms. McCartin, that the statement of law we should be looking to is Todd v. Skelly.  Where an agent acts in his own interest, which is antagonistic to that of his principal, or commits a fraud for his own benefit in a manner which is beyond the scope of his actual apparent authority or employment, the principal who has received no benefit therefrom will not be liable for the agent's tortious conduct. Now, you've asserted that that no-benefit language should be excised. Why? No, not excise, Your Honor. I'm saying that is what the court was saying was the case in Todd v. Skelly. Now, the fact of the matter is there was no benefit to the corporation here, and I'll demonstrate that to you when I come back here. But the test should be whether the agent is acting in his own interest or for the benefit of the corporation. And if there is any benefit to the corporation, the question that the jury ought to decide is whether that conduct was undertaken primarily in their own interest instead of the best interest of the corporation or to confer whatever benefit may be. Okay. Where are you getting that primarily language from? See, I'm not trying to be difficult. I'm just trying to pin you guys down on the standard. When you say, well, that no benefit was really the fact finding that case, that's not how I read this. I read this as being a statement of law. And I hear you saying that's not really the law. The law isn't no benefit. It's a primary test. No, I'm not saying that. Where are you getting that from? Well, some of the cases refer to primary benefit. Some say whether the agent is acting solely in his own interest instead of the interest of the corporation. And the fact that there is a benefit is not controlling. The district court here said that any benefit conferred upon the corporation as a result of this conduct, which we say is not the case here, was enough to prevent the adverse interest exemption from applying. Therefore, I, again, think about because of this, and Todd V. Skelly is, what, 52 years old? Yeah. Should we consider certifying this to allow this whole area to be straightened out? If it's under state law, why not give Pennsylvania the first chance? Thank you. Mr. Rafferty? Thank you very much. Thank you. I'm pleased to call up Tom Rafferty on behalf of PricewaterhouseCoopers. Do you want to respond to? I want to answer your three questions. You each have questions on the same issue, which is what's Pennsylvania law on this imputation question. And if it's ambiguous, and there are, since 1956, a lot more case law on the concepts of deepening insolvency and peri-delicto, et cetera, and New Jersey having gone one particular way, why not at least allow these folks in Pennsylvania, who are very adept at interpreting their own law, the first chance of doing it? Well, I wouldn't object to that, Your Honor, but I don't think it's necessary. There are cases that are post-Todd V. Skelly, and I believe Todd V. Skelly was largely turned on the fact that the agent was acting outside of the scope of his agency. The fact that there was no benefit to the bank flowed from the finding that the agent was not within the scope of his agency. One could read Todd V. Skelly as possibly the prior paragraphs all talk about ratification. Did the company ratify the bad acts of the agents? Maybe that's what any benefit means, maybe not. But I'm not completely sure. And what I'm particularly worried about is us writing an opinion that somehow screws up, in effect, when you look at this, no matter how it all comes out to me, is respondeat superior. Are they acting for the corporation under principles of respondeat superior, or are they not? Let me take that a piece at a time. Why should we take the first crack? Because I don't think you are taking the first crack. Judge Michel asked at the beginning whether or suppose the agent was acting with a dual purpose. Well, the Supreme Court of Pennsylvania dealt with that in the Gordon v. Continental Casualty case. And what they said was, and I'm quoting, mere fact that an agent's primary interests are not coincident with those of the principal does not prevent imputation. Because the normal standard of agency is if I am acting within the scope of my agency or my employment, in what I'm normally hired to do, and I commit a wrong or I gain some knowledge, my principal is liable for my wrong conduct and my knowledge is imputed to them, unless there is an exception, the adverse interest exception. And the adverse interest exception says, am I acting solely for my own benefit and adverse to my principal? Am I acting entirely for my own benefit? It's all the same test. Well, that's really the question, right? That's exactly what we were asking Mr. McCartney. He says, no, that isn't the test. Well, it is the test, Your Honor. Okay, so instead of asserting it, point us to the law that you're relying on. Okay, in 1985. It says solely, only. In 1985, the Supreme Court of Pennsylvania dealt with an imputation case called Aiello. And in Aiello, it was a real estate broker whose agent made misrepresentations to a couple buying some land about whether or not they could put a sewage system on the land. And what the Supreme Court of Pennsylvania held was that the principal was liable for the agent's conduct, even though it was unauthorized, it was unknown to the principal, and in fact forbidden, and even though the agent himself had a motivation for securing his commission by the sale of this land, no commission, no sale, no commission. The Supreme Court of Pennsylvania didn't say we're troubled by any of this. They said the principal's liable. The agent was acting within the scope of his employment. It was what he was doing. He went out to sell real estate. He made misrepresentations. He wasn't authorized to lie about the properties of the parcel that he was selling, but he did it anyway. That's typical agency law. It's what Judge Boudin said in the Baena case. If a corporate president engages in price fixing, even though the board of directors expressly forbade it and would have stopped him had they known, the corporation is still subject to civil liability. I mean, if I turn it around here, and I'm sure Mr. McCartan would disagree with the proposition that Price Waterhouse said, we never approved of someone doing a substandard audit or certifying false financial statements, and therefore these people were doing that and they were trying to keep their jobs, and we shouldn't be liable. That's just not how agency law works, and I don't believe there's any current confusion. The New Jersey Supreme Court, an NPC, made some policy decisions about how New Jersey was going to interact with auditors. The Pennsylvania courts have never done anything approaching that. Well, let's take a step back and ask a broader question. There's certainly been a good deal of argument in the papers about whether it is consistent with principles of equity to allow somebody who is accused of being complicit, which is the nature of the allegation against your client, to use in peri delicto doctrine against, well, as a shield, in effect, that this is turning equity on its head to allow a wrongdoer to say, protect me from my wrongdoing. What's the response you have to that? Okay, I want to take this slowly because I think, first of all, this is not purely an equitable doctrine. Although Lafferty said it was. Well, but the Third Circuit in the Terrasi case said it was a common law doctrine. Which case? Terrasi, the Pitts National Bank, which is a 1977 Third Circuit case. But the latest case is Lafferty. Okay, but let me take that piece by piece, Your Honor. Lafferty barred a series of claims, including a quintessential legal claim, breach of contract. But didn't Lafferty say that in peri delicto is an equitable defense? It absolutely did, Your Honor. But in most times equitable defenses, unclean hands will not bar a breach of contract. It's really, in one sense, when you think about it, don't you really go back to Judge Posner's comments in Senko? It's a concept, and we use this concept that if I'm suing you but I have untainted in some way, that in the negligent, or if it's for tort, I can be found contributory negligent, or under today's law in some states like Pennsylvania, comparatively negligent. If it's a contract, did I impede your performance, et cetera. If I do something, I can't sue you and take advantage of your wrongs when I'm also at fault. But that is precisely what's happening here, Your Honor. But isn't that an equitable concept? Well, it's an equitable concept, Your Honor, but the first place in peri delicto appears is in the 1760 case of the King's Bench, Smith v. Bromley, which is a law decision. It's a case in the subset of the contract. You're absolutely right. But at this point, it seems to have morphed for most people into an equitable concept. Yeah, and morphed in a binding precedent in our court to say it's an equitable doctrine. But it is at least an equitable doctrine that reaches out to bar legal claims as well as equitable claims. It's not simply a doctrine that bars requests for injunctive relief. Okay, so it's reaching out and barring that. This is a case in which a principal, the AHRQ, kept a second set of books. It knew everything that we are accused of missing in these audits. And those are the undisputed facts. The officers kept a second set? Not just the two. The officers, the top management of the company. But the board wasn't part of that, was it? Except for Apto. Well, actually, Your Honor, I don't think you can go that far. I don't think we have to have this fight today. Because there's a question of fact. No, I don't think there's a question of fact. Let me just go to it. This appellant sued the top management of this company and three of the directors of the company. Four of the directors, actually. Interestingly enough, the three of the directors they sued were the directors that in their brief they claimed were the innocent decision makers. And those directors... And I want to come back to the second set of books because I think it's important to go to... What they said about these directors was... One of them, Mr. Barnes. Now, they said this. They had a complaint and it's part of the record. But they also received interrogatories in that matter. And they responded with sworn interrogatory statements. And those are part of the record as well. And they said, for example, that Mr. Barnes knew in Fiscal 95 and 96 that A. Herb was experiencing declining financial performance, negative cash flow, and increasing accounts receivable. And they went on to say that Mr. Barnes knew that A. Herb was relying on actions such as changes in accounting techniques. Okay, well, Mr. Rafferty, aren't you inviting us to wade into the... Not meaning to sound pejorative, but the swamp of factual disputes? I mean, that's what it sounds like you're doing is saying, come on in here... No. Because there's a whole bunch of stuff that would show that these guys weren't such innocent directors. All they're asking for is a trial. Well, I don't think so, Your Honor, because these are interrogatory answers from my opponent. They're admissions. Sure, if they're judicial admissions, that's some evidence for your position. But it's not dispositive evidence for your position. I'm having a hard time with the argument that there's some evidence, including admissions, that they knew what was going on as being factually dispositive. Okay, well, let me take... We're talking about facts. I was trying to respond to Judge Amber's question as the trustees as opposed to the top management. So let me at least start with the top management of the company. They had... There were three accounting issues, audit failures that they claim here. They have to do with accounting for bad debt reserves, the use of excess reserves to smooth out income in various of these operations. Because remember, the record's undisputed that what they were doing was they were buying hospitals that were on the verge of bankruptcy themselves on the theory that they were going to miraculously flip them over and make them profitable. And the final accounting issue has to do with the misuse of certain trust funds that were restricted and AHRQ nonetheless recorded the income on its balance sheet as income when it was not available to it. All these things have a couple of things in common. The first is that they don't involve actual movement of cash. These are balance sheet entries that end up in the income statement reflecting what income you have, but they're not real money moving around. This is an alluding case like any of the cases that they tend to rely on in their papers. The second thing is for each of those, they had a second set of schedules which they did not share with the auditors which reflected the actual condition of the company. So they had things that in turn... Let me go back to where Judge Jordan is because what he's saying is let's just step back from all of this. And when you step back and let's assume for the moment, and believe me, you're not conceding this. Let's assume for the moment that there were individuals actually at Cooper's at the time that were part of the problem with Abduhak and the CFO. In that context, why should it be fair or equitable for now PwC having taken over Cooper's to use as a defense something that was put in, at least in modern times, equitably when in fact they were acting inequitably? Well, because, Your Honor, at the outset, what the court below did, which is what I believe is the equitable part of impar delicto, was it made the determination that Aherb was at least equally or mutually at fault. I think the district court found that Aherb was a primary wrongdoer. Can they make that finding a fact without a trial? Yes, they can because the overwhelming evidence that they... Let me take you to... My question, here's my question. Assume, without conceding anything, that your client was culpable along with the officers in what was going on in 95, 96, 97. If they were of equal fault, that's exactly what the doctor... Let's just assume that they were part of the problem and not part of the solution. Why is it that they now, the PWC, should be allowed to hide behind an equitable defense in modern times when their people acted inequitably? Because the defense itself, Your Honor, assumes that the person invoking it has mutual fault with the person against whom it's being invoked. And all the defense says... And I've asked you to assume that. All the defense says is that, in that case, the position of the defending party under the doctrine is better. Now this... That, you're assuming out of the discussion, the primary point here. The primary point is, and maybe this is what makes this discussion difficult. There's an assumption in your response that we are imputing everything bad that the bad actor officers did to the corporate entity and that the rollover in control has no bearing on what would be equitably sensible here. I mean, there's certainly cases out there, and you've seen it because your opponent has cited them, that say, in a context like this where the bad actors, the bad agents have been pitched, innocent people who were being harmed before are now in control, it doesn't make sense to do a sort of a straight-up application of imperative delicto because you're not talking about two dirty hands anymore. You're talking about one clean hand and one dirty hand, and the dirty hand can't get the advantage to put it in artfully. But that's what I think we're trying to get you to speak to. Okay, I think your question assumes facts that are inconsistent with the record. It may very well be the case, but they're facts. Remember, the start of this was not facts. Let's just assume, without conceding, that your folks were culpable. Assuming my folks were culpable. Right now, what Lafferty says is that you look at the defense and the claims in the hands of the debtor as of the date of the bankruptcy. There is no argument, there was no argument, and there could be no argument that the culpable parties, all of them, that there was a housecleaning, the trustees that the appellant sued and the other offices that they sued, other than McConnell and Abdullak, were all still in place after the bankruptcy. Some of them long after the bankruptcy began. You haven't even begun to answer our question. Our question is, if your clients are part of the problem, how can you invoke an equitable defense for your own inequity? Because that's what the defense provides. If this were a suit by shareholders, if it were a suit by a third party... But in New Jersey, the New Jersey Supreme Court went the other way and says that if your clients are culpable, they can be sued by a successor to the debtor. But the New Jersey court then would be overruling the finding in Lafferty that said we measure this as of the date, and you assume that the plaintiff here... Would you have a problem if we certified this to the Pennsylvania Supreme Court? No, I started out by saying I wouldn't have a problem. I don't necessarily see it as a question that there is some confusion on. Isn't the statement in Lafferty not that we freeze the facts as of the day of the filing, but it's the claims that exist as of the time? You seem to be saying that Lafferty laid down a rule that the factual scenario in place on the day of the declaration of bankruptcy is what you have to deal with under 541. But I thought I read Lafferty... I thought Lafferty said you can't take post-petition events into account in deciding what the claims are. Am I wrong about that? I think so, Your Honor, because I think what Lafferty actually said was that the trustee succeeds to whatever claims the debtor has. And I think what they said, and I'm hoping I'm remembering this correctly, is of course they are subject to whatever defenses could have been raised against the claims in the debtor's hands. If Ahrefs had sued PWC prior to its bankruptcy, Ahrefs itself had said you're responsible for our business decisions, for our cash shortfall because you did a bad audit in 96 and 97, this defense would apply. If Ahrefs had been a public corporation and the shareholders had sued PWC, the defense doesn't apply. The crucial distinction in this defense is it is a defense as between two wrongdoers. And it's a court saying I'm not going to allow the wrongdoer, Ahrefs, to succeed in bringing a claim against someone who is equally as culpable. If the actions of the officers can be imputed under law to the corporation. Well, I believe that the district courts correctly imputed the actions under law to the corporation. There is no question that what these men were doing, and I want to call out... And there's a good argument for that under Aiello. There's no doubt in my mind there is. But why not allow in this circumstance with these facts the Pennsylvania Supreme Court the opportunity to take the first crack at it? Well, I can't object to that, Your Honor. But what I will say is that you have to remember, we've been talking about two wrongdoers. In each of the years that the audits were challenged, there were representation letters made by Ahrefs management, signed by the top four managers. And in 96, it was a Mr. Spargo was the fourth signatory. In 97, it was a Mr. Adamczak. Mr. Adamczak and Mr. Spargo were both certified public accountants. They're the ones who had the day-to-day responsibility for preparing Ahrefs financial statements. This is the unusual case where when they were deposed, and Mr. Adamczak was still at Ahrefs past the bankruptcy, when they were deposed, they both testified that when they made those representations in writing, they knew them to be false. They knew that what they were telling the outside auditors wasn't true. So you've got a case in which even if you assume, as you've assumed, that there's mutual fault here, and that the fault is precisely equal, that's what the doctrine was designed to prevent. Someone of equal fault suing someone else of equal fault in recovery. If there was somebody else to sue us... Provided that you impute to the corporation the acts of the officers. Absolutely, but the officers were... Mr. Spargo and Mr. Adamczak were charged with preparing the financials. They made the representations on behalf of Ahrefs. They all understood that they were working within the scope of their employment. And there were enormous benefits to Ahrefs. They were making a bet. The appellant itself, in its amended complaint, conceded that a lot of these acquisitions gave Ahrefs access to new streams of income. That was part of the motivation for it. You took on this debt, which was long-term, but you also got whatever the day-to-day cash flow was. And so there were enormous benefits that Ahrefs reaped in the short term. My last question is back to something to repeat what Judge Jordan had asked. If you're alleging that there is... or the other side would allege that there is an adverse interest of the employees to the corporation, and then you're alleging in return that they dominated the board, isn't that a fact-intensive question that has to be resolved by a jury? I don't believe so, Your Honor, because I don't believe there was any dispute that Mr. Abdelhak and his management team... But how could you resolve it on summary judgment in the face of contrary testimony? Well, it wasn't resolved, Your Honor. Or contrary evidence, I should say. There was no contrary evidence, and it wasn't resolved. Well, from some of the directors there was, wasn't there? Well, but this is very much like the SITEX case, Your Honor. The directors were sued, those directors, the ones who were cited in the appellant's opening paper. And then they reached a settlement with the appellant, and then all of a sudden it was could've, would've, should've. But when they were sued, what they were... But this is a credibility... Are credibility determinations really unresolvable on summary judgment? Well, I don't believe that all credibility determinations are. I think Your Honor's decision in SITEX indicated that there are times when you can decide on the papers when someone says A here and then not A here. But also, wouldn't Cooper's knowledge be a fact question? Cooper's knowledge of, I mean, for the purposes... Of wrongdoing. They may have known nothing. Believe me, I'm not casting any aspersions on this. And I understand we're working in the world of assumption. At the district court level, Your Honor, what I said when I started the argument was we're not here defending the audit, and you can assume that Cooper's behaved badly and that they did a substandard audit. That was the assumption, because if you don't have that assumption, if you come in and you say, I'm innocent, but I'm pleading impari delicto, the doctrine isn't available to you. It has to be equal or mutual fault. Impari delicto assumes fault on the part of both parties, which is why I have some trouble with labeling it entirely equitable, because it's the one equitable doctrine, if Your Honor is right, and I assume Your Honor it's equitable, the one equitable... Well, that's the way a lot of modern... Certainly that's the way Lafferty interpreted it. I mean, you're absolutely... And looking back, you're correct to start it off legal, but I think it's morphed, perhaps, at least in some judges' minds. That may be, Your Honor, but it is the only equitable doctrine of which I'm aware that is designed to deal with the circumstance in which you have a pair of wrongdoers contesting one another. You have contributory negligence, you have comparative... I mean, you have all kinds of things. It's sort of a catch-all. The point that rang with me, at least intellectually, was Judge Posner's criticism of this. It's got other names. We don't have to really rely on this a whole lot. It's a concept. It's more than a defense. It is a concept. It's a Latin maxim from the 1700s. I have no doubt about that, but it's a maxim that this Court has applied, that the Supreme Court of Pennsylvania has repeatedly applied, as recently as 1985, which isn't so recent for some of us. For some of us. For others, it's not.  But the Iowa case in 1985 had no trouble imputing the knowledge and tagging the principle with the conduct of the agent. And in this case, we believe that the district court correctly analyzed the law, applied the right standard, both the imputation standard, as well as the standard for when imparability should be applied. Thank you very much. By the way, Peter, I wasn't talking about you for being young in 1985. Just trying to get the record straight. Your Honor, may I first address this question of whether this was a substandard audit. I made this point earlier, but I want to emphasize here, this is not a matter of mere negligence, the performance of the audit function. This is a matter of actual collusion in the preparation of these statements and the certification. We can't decide any of that here. This is appellate summary judgment. We're going to decide all the facts. No, Your Honor, but I'm saying that is why this should have been submitted to a jury. This conduct resulted in overstatement of earnings in 1996 of $90 million and $150 million in 1997, when in fact the foundation sustained a loss of $80 million in 1996 and $130 million in 1997. What is your thought on the certification question? I think it would certainly be appropriate, Your Honor. I don't think it's necessary, but I think it would be appropriate. Your Honor, you've really got a major problem, don't you, that Mr. Rafferty points out, that the most recent pronouncement, at least that I have found, is Aiello. And Aiello, it ain't helping you. No, Aiello is a responding and superior case. And you heard my comment that I don't want to screw up responding and superior laws. We truly are, but when they imputed the conduct of the agent to the principal in order to protect innocent people, that is not the case here. The auditors are not an innocent party. How do you respond to Mr. Rafferty's assertion that under the interpretation of Section 541 of the Bankruptcy Code that binds us through Lafferty, we have to look at not just claims, but defenses as of the date of the bankruptcy filing, and the defenses available as of the date of the bankruptcy filing included in peri delicto, because all the bad people were still in place and doing bad things. Your Honor, unlike Lafferty, in this case, Abdelhok and McConnell were fired pre-petition. The Court does not have to look post-petition to see if the entity itself was cleansed, as was the case in Lafferty. Lafferty Court made no of the fact. So even though there were still some bad actors there, as of the petition date, you're saying, as a distinction from Lafferty, you can see that the entity was, if not pure as the driven snow, it was running itself through the rinse. Is that what you're, in effect, saying? It ran itself through the rinse pre-petition, and there is an absence pre-petition of any evidence that any wrongdoer would therefore participate in recovery here. Lafferty did not hold that the Court had to be blind to the reality of the situation when applying an equitable defense. Lafferty was concerned with the import and meaning of Section 541. That, as I pointed out earlier, is a matter of federal law. Whether or not the imputation doctrine should be applied here, and whether or not in peri delicto should be applied here, are matters of Pennsylvania law. The District Court, excuse me, the District Columbia Court of Appeals and the BCCI case and the NCP, New Jersey Supreme Court, in that case, they stopped this short in imputation, saying a party who was not an innocent party, and that would be the auditors here, may not even invoke imputation. They didn't even get to the question of in peri delicto. They refused to permit imputation being invoked by a wrongdoing party. Now, what's your response to Mr. Lafferty's assertion that that doesn't just sort of put a gloss on in peri delicto, that obliterates the doctrine utterly because, and I'm paraphrasing here, but I take his point to be in peri delicto assumes a wrongdoer. It doesn't make any sense to say only an innocent party can invoke in peri delicto because by definition in peri delicto is who can benefit in a circumstance of equal fault. They're both wrong to begin with. It only exists in a world where both parties are wrong. The answer, I think, is that the doctrine should not be, being an equitable doctrine, it should not be implied when we'll produce an inequitable result. And here, here, no wrongdoer, looking only at pre-petition, has benefited from the recovery. In Lafferty, that was the dissent of Judge Cowan. But it was a dissent, which means it was considered and rejected by the majority. No, it wasn't considered and rejected by the majority. Judge Cowan attached a great deal of significance to the fact that what he thought was the critical consideration was that Ablehawk was not dismissed until post-petition. No, but the point is that Judge Cowan's point was you can't have equitable considerations or things that are inequitable somehow made to be equitable under this doctrine, and it didn't make sense to him. It was a disconnect, and the majority considered that and rejected it under PA law. That's right. All the more reason I'm asking whether we should certify. Your Honor, I thought that would be appropriate, although not necessary in this case. Thank you very much. Thank you. It's a tough case and a very interesting issue. Thank you to both sets of counsel for a well-presented argument. I would ask, counsel, if you would speak with Patrick afterwards in order that a transcript can be prepared of this oral argument. Thank you, Your Honor. Thank you all.